IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | | |
|---|---|---|
| REBECCA L. WILLIAMS, | ) | |
|    Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:14cv00045 |
| | ) | |
| CAROLYN W. COLVIN, | ) | **MEMORANDUM OPINION** |
|   Acting Commissioner of | ) | |
|   Social Security, | ) | BY: PAMELA MEADE SARGENT |
|    Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Rebecca L. Williams, ("Williams"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

-1-

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Williams protectively filed an application for DIB on September 7, 2011, alleging disability as of August 27, 2011, due to knee and back problems, a left leg injury, left thigh pain, arthritis, hypertension and anxiety. (Record, ("R."), at 197-98, 209, 213, 249.) The claim was denied initially and on reconsideration. (R. at 115-17, 121-23, 126, 128-30, 132-34.) Williams then requested a hearing before an administrative law judge, ("ALJ"). (R. at 25, 135.) A hearing was held on July 9, 2013, at which Williams was represented by counsel. (R. at 43-82.)

By decision dated July 24, 2013, the ALJ denied Williams's claim. (R. at 30-38.) The ALJ found that Williams met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2012. (R. at 32.) The ALJ also found that Williams had not engaged in substantial gainful activity since August 27, 2011, her alleged onset date.[1] (R. at 32.) The ALJ found that the medical evidence established that, through the date last insured, Williams suffered

---

[1] Therefore, Williams must show that she became disabled between August 27, 2011, the alleged onset date, and December 31, 2012, the date last insured, in order to be entitled to DIB benefits.

-2-

from severe impairments, namely history of a left femur fracture with rod placement with current lower extremity pain; degenerative disc disease; osteoarthritis with bilateral knee pain; obesity; affective disorder; and anxiety-related disorder, but he found that Williams did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 32-33.) The ALJ found that Williams had the residual functional capacity to perform simple, easy-to-learn, repetitive, unskilled sedentary work,[2] which did not require more than occasional climbing of ramps and stairs, balancing, crouching and stooping; that did not require her to use her bilateral lower extremities for operation of foot controls, climb ladders, ropes or scaffolds, kneel or crawl; and that did not expose her to extreme cold, vibration, wetness and hazards, such as dangerous machinery and unprotected heights. (R. at 34.) The ALJ found that, through the date last insured, Williams was unable to perform any of her past relevant work. (R. at 37.) Based on Williams's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that other jobs existed in significant numbers in the national economy that Williams could perform, including jobs as an assembler, a packer and an inspector/sorter. (R. at 37-38.) Thus, the ALJ found that Williams was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 38.) *See* 20 C.F.R. § 404.1520(g) (2015).

---

[2] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2015).

After the ALJ issued his decision, Williams pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 2-5.) Williams then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2015). The case is before this court on Williams's motion for summary judgment filed June 15, 2015, and the Commissioner's motion for summary judgment filed August 11, 2015.

## II. Facts

Williams was born in 1969, (R. at 54, 197), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). Williams has a post-graduate two-year degree in nursing and past relevant work as a staff nurse, a medication nurse, a nurse supervisor, an owner/administrator of an assisted living facility, a fast food worker and a laundry worker. (R. at 54, 214.) At her hearing, Williams testified that the state board of nursing suspended her nursing license due to her felony conviction. (R. at 54.) She stated that she owned and operated an assisted living facility. (R. at 58-59.) Williams testified that, following her release, she worked at a dry cleaning and laundry service, through the Virginia Workforce Program, as a condition of her probation. (R. at 56.) Williams stated that she fractured her left leg in an August 2006 motor vehicle accident, underwent surgical rod placement and continued to experience pain daily. (R. at 59-60.) She stated that the pain affected her ability to concentrate and to balance. (R. at 60.) She testified that she experienced shooting and burning pain from her left leg to her knee at least

-4-

Case 2:14-cv-00045-PMS   Document 17   Filed 12/28/15   Page 4 of 18   Pageid#: 497

three to four times a week. (R. at 60.) Williams stated that she used a tripod cane at times, but that the cane was not prescribed by a doctor. (R. at 61.) She stated that she elevated her leg two to three times a week for 30 to 40 minutes at a time due to pain. (R. at 61-62.) Williams stated that she could stand 30 to 40 minutes without interruption and that she could not walk the distance of one street block. (R. at 62-63.) She reported lying down daily for 45 minutes to one hour. (R. at 64.)

John Newman, a vocational expert, also was present and testified at Williams's hearing. (R. at 73-81.) Newman was asked to consider a hypothetical individual of Williams's age, education and work history, who had the residual functional capacity to perform simple, easy-to-learn, repetitive, unskilled sedentary work, which did not require more than occasional climbing of ramps and stairs, balancing, crouching and stooping; that did not require her to push or pull with her lower extremities, such as operating foot controls, climb ladders, ropes or scaffolds, kneel or crawl; and that did not expose her to extreme cold, vibration, wetness and hazards, such as dangerous machinery and unprotected heights. (R. at 75-76.) Newman stated that such an individual could not perform any of Williams's past work. (R. at 76.) He stated that there was a significant number of jobs that existed that such an individual could perform, including jobs as an assembler, a packer, a stuffer, an inspector, a tester, a sorter and a gauger. (R. at 76-77.) Newman stated that the same individual would be able to perform the identified jobs should she be limited to sitting, standing or walking two hours in an eight-hour workday. (R. at 77.) He stated that the allowable absenteeism for sedentary work is one day per month. (R. at 77.) Newman testified that there would

be no jobs available should the individual require a sit, stand and move around option, who would be required to take unscheduled breaks and who would be off-task 25 percent of the workday. (R. at 77-79.)

In rendering his decision, the ALJ reviewed medical records from Richard J. Milan, Jr., Ph.D., a state agency psychologist; Dr. Andrew Bockner, M.D., a state agency physician; Dr. Robert McGuffin, M.D., a state agency physician; Forrest Rackham, Psy.D.; Wellmont Holston Valley Medical Center; Mary Elizabeth Ballard, M.A., a senior psychological examiner; Diane L. Whitehead, Ph.D., a licensed clinical psychologist; Stone Mountain Health Services; Dr. Mark Russ, M.D.; Medical Associates at Big Stone Gap; Dr. Sreenivasan C. Kotay, M.D.; Karen Stallard, F.N.P., a family nurse practitioner; and Dr. Rob D. Sawyer, D.O.

In August 2006, Williams was admitted to Wellmont Holston Valley Medical Center following a motor vehicle accident to repair a left femur fracture. (R. at 271-74.) Upon discharge, Williams was not mobile; physical therapy was ordered; and a rolling walker was prescribed. (R. at 271.)

The record shows that Williams was treated at Stone Mountain Health Services[3] from August 2010 through November 2012 for various complaints such as bilateral knee pain; depression; ankle pain; headaches; hypertension; and back pain. (R. at 285-385.) In September 2010, Williams complained of ankle and knee

---

[3] Williams was treated by Dr. Abdul-Latief Almatari, M.D., and Teresa Ellis, F.N.P., as well as a number of licensed practical nurses.

-6-

pain with prolonged standing. (R. at 328.) In December 2010, Williams reported increased stressors. (R. at 325.) However, in January 2011, Williams reported that her mood was better with medication, and she had a normal mood and affect. (R. at 321-22.) In April and May 2011, Williams complained of right knee pain. (R. at 314-15, 317-18.) On May 12, 2011, x-rays of Williams's lumbar spine showed degenerative disc disease at the L3-L4 level and arthritic changes of the sacroiliac joints. (R. at 334.) X-rays of Williams's right knee showed a moderate degree of degenerative changes of the medial and lateral compartments and a small effusion. (R. at 334.) On June 8, 2011, Williams was given a Lidocaine injection in her right knee. (R. at 308, 311.) From August 2011 through November 2011, Williams was seen for her complaints of situational depression. (R. at 290-305.) During this time, Williams repeatedly reported improvement in her mood with medication and stated that behavioral health intervention was helpful. (R. at 290-305.) It was noted that Williams had normal memory, mood and affect, and her judgment and insight were deemed as good. (R. at 291, 297, 300, 306.) In August 2011, Williams reported increased right knee pain and intermittent swelling. (R. at 305.) She also reported increased low back pain with prolonged sitting, standing, bending and stooping and numbness in both hands. (R. at 305.) In November 2011, Williams complained of left knee pain, stiffness and swelling. (R. at 290.)

On March 6, 2012, Williams reported that she was anxious and stressed, which caused her to socially isolate. (R. at 384.) Her mood and affect were deemed normal. (R. at 385.) On June 14, 2012, examination of Williams's back was normal. (R. at 377.) She had normal muscle strength and no atrophy, tremor or

-7-

Case 2:14-cv-00045-PMS   Document 17   Filed 12/28/15   Page 7 of 18   Pageid#: 500

sensory deficit was noted. (R. at 377-78.) Williams reported that her depression was doing well and that her hypertension was well-controlled. (R. at 378.) On August 22, 2012, examination of Williams's back was normal. (R. at 371.) She had normal muscle strength and no atrophy, tremor or sensory deficit was noted. (R. at 371.) Williams had tenderness in her upper back. (R. at 371.) Williams reported that her depression had improved, as well as her left hip pain. (R. at 371.) On November 6, 2012, Williams complained of chronic burning pain in her left lower leg. (R. at 364.) Her gait and range of motion were normal. (R. at 365.) She had a normal musculoskeletal examination. (R. at 365.) Williams's judgment was deemed appropriate, and her insight and affect were noted as good. (R. at 365.)

On December 21, 2011, Williams was evaluated by Mary Elizabeth Ballard, M.A., a senior psychological examiner, and Diane L. Whitehead, Ph.D., a licensed clinical psychologist, at the request of Disability Determination Services. (R. at 275-81.) Williams presented with a predominately flat affect and depressed mood. (R. at 275.) Her speech and behavior were appropriate. (R. at 278.) She was diagnosed with dysthymic disorder and an anxiety disorder, not otherwise specified. (R. at 280.) Ballard and Whitehead assessed Williams's then-current Global Assessment of Functioning, ("GAF"),[4] score at 53,[5] with her highest score

---

[4] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[5] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

being 63[6] and her lowest score being 53 within the previous six months. (R. at 280.) Ballard and Whitehead opined that Williams had the ability to understand and remember simple instructions, to maintain age-appropriate social behavior and the basic standards of neatness and cleanliness and to respond appropriately to changes in the work setting and to be aware of normal hazards and take precautions. (R. at 280-81.) They opined that Williams had a mild limitation in her ability to sustain concentration and persistence at an adequate level and to work in coordination with and/or proximity to others without being distracted by them. (R. at 280.) They also found that Williams was moderately limited in her ability to understand and remember detailed instructions and to travel unaccompanied in unfamiliar places or use public transportation. (R. at 280-81.)

On January 5, 2012, Dr. Richard Surrusco, M.D., a state agency physician, opined that Williams had the residual functional capacity to perform light work.[7] (R. at 90-91.) He noted that Williams could occasionally climb ramps and stairs, balance, stoop and crouch and never climb ladders, ropes and scaffolds, kneel or crawl. (R. at 90.) No manipulative, visual or communicative limitations were noted. (R. at 90.) Dr. Surrusco found that Williams should avoid concentrated exposure to extreme cold, wetness, vibration and hazards. (R. at 91.)

---

[6] A GAF score of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well ...." DSM-IV at 32.

[7] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2015).

On January 11, 2012, Dr. Andrew Bockner, M.D., a state agency physician, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Williams suffered from an affective disorder and an anxiety-related disorder. (R. at 87-88.) He found that Williams had no limitations on her ability to perform her activities of daily living. (R. at 88.) Dr. Bockner reported that Williams had mild difficulties in her ability to maintain social functioning and moderate difficulties in her ability to maintain concentration, persistence or pace. (R. at 88.) He opined that Williams had not experienced any episodes of decompensation. (R. at 88.)

That same day, Dr. Bockner completed a mental assessment, indicating that Williams had no significant limitations in her ability to remember locations and work-like instructions; to understand, remember and carry out very short and simple instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to make simple work-related decisions; to complete a normal workday or workweek without interruptions from psychologically based symptoms; and to perform at consistent pace without an unreasonable number and length of rest periods. (R. at 91-93.) He opined that Williams was moderately limited in her ability to understand, remember and carry out detailed instructions. (R. at 92.)

-10-

On May 24, 2012, Dr. Robert McGuffin, M.D., a state agency physician, opined that Williams had the residual functional capacity to perform light work. (R. at 105-06.) He noted that Williams could occasionally climb ramps and stairs, balance, stoop and crouch and never climb ladders, ropes and scaffolds, kneel or crawl. (R. at 105-06.) No manipulative, visual or communicative limitations were noted. (R. at 106.) Dr. McGuffin found that Williams should avoid concentrated exposure to extreme cold, wetness, vibration and hazards. (R. at 106.)

On May 24, 2012, Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed a PRTF indicating that Williams suffered from an affective disorder and an anxiety-related disorder. (R. at 103-04.) He found that Williams had no limitations on her ability to perform her activities of daily living. (R. at 103.) Milan reported that Williams had mild difficulties in her ability to maintain social functioning and moderate difficulties in her ability to maintain concentration, persistence or pace. (R. at 103.) He opined that Williams had not experienced any extended episodes of decompensation. (R. at 103.)

That same day, Milan completed a mental assessment, indicating that Williams had no significant limitations in her ability to remember locations and work-like procedures; to understand, remember and carry out very short and simple instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without

-11-

being distracted by them; to make simple work-related decisions; to complete a normal workday or workweek without interruptions from psychologically based symptoms; and to perform at consistent pace without an unreasonable number and length of rest periods. (R. at 107-08.) He opined that Williams was moderately limited in her ability to understand, remember and carry out detailed instructions. (R. at 108.)

On September 26, 2012, Dr. Sreenivasan C. Kotay, M.D., saw Williams for complaints of frequent bilateral knee pain and burning exacerbated by motion at the knee, weight bearing, walking and squatting. (R. at 417.) She described her symptoms as "mild and worsening." (R. at 417.) She reported that nonopioid analgesics relieved the pain. (R. at 417.) Neurologic examination revealed normal findings, including no back pain, decreased range of motion, joint pain or muscle weakness. (R. at 417.) Dr. Kotay noted marked tenderness on the medial joint on the right side of the knee. (R. at 418.) An x-ray of Williams's right knee showed moderately severe medial compartment arthritis. (R. at 418.) Dr. Kotay diagnosed degenerative joint disease of her knee and noted a loss of terminal motion about 10 to 15 degrees on the right, as well as patellofemoral tenderness on both sides with mild crunching on motion. (R. at 418.) Dr. Koty recommended a Synovisc injection to preserve right knee motion, but Williams opted not to pursue such treatment at that time. (R. at 418.)

The record shows that Williams was treated by Karen Stallard, F.N.P., a family nurse practitioner with Medical Associates at Big Stone Gap from January

2013 through December 2013. (R. at 7-9, 401-15.) On January 23, 2013, Williams complained of frequent bilateral knee pain exacerbated by motion at the knee, weight bearing, walking and squatting. (R. at 414.) She described her symptoms as "mild and worsening." (R. at 414.) She reported that nonopioid analgesics relieved the pain. (R. at 414.) Williams denied anxiety, depression and mood changes. (R. at 415.) Stallard diagnosed degenerative joint disease of the knee. (R. at 416.) On February 27, 2013, Williams complained of abdominal pain. (R. at 410.) However, on March 25, 2013, she reported that her abdominal pain was relieved with medication. (R. at 405.) She denied anxiety, depression and mood changes. (R. at 406.) On April 25, 2013, Williams complained of knee pain and swelling. (R. at 401.) Her mental status was within normal limits. (R. at 402.) She was referred to an orthopedic specialist for management of her knee pain. (R. at 402.) On December 30, 2013, Stallard diagnosed joint pain; depression; snoring; headache; osteoarthritis; low vitamin D level; high blood pressure; urinary complications; and carpal tunnel syndrome. (R. at 7.)

On May 7, 2013, Dr. Mark Russ, M.D., saw Williams for her complaints of chronic right knee pain. (R. at 420.) Examination of Williams's right knee showed no swelling, deformity or signs of acute trauma. (R. at 420.) He noted that the right medial joint line demonstrated moderate swelling and mild crepitus in the knee with flexion and extension at the patellofemoral joint compartment. (R. at 420.) She had full range of motion of the right knee. (R. at 420.) X-rays of Williams's right knee showed minimal early degenerative changes with squaring of the medial femoral condyle with subchondral sclerosis. (R. at 420-21.) Dr. Russ diagnosed

degenerative joint disease and osteoarthritis of the right knee and right knee pain. (R. at 421.)

The record shows that Williams saw Forrest Rackham, Psy.D., on three occasions in 2013. (R. at 11-16.) During this time, Williams complained of being stressed and tired. (R. at 11, 13.) She reported taking care of her husband's needs and caring for her mother. (R. at 12-13.) She was diagnosed with depressive disorder, not elsewhere classified, and anxiety. (R. at 12, 14, 16.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its

-14-

judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings.

Williams argues that the ALJ erred by failing to give appropriate credence to her testimony and to properly assess the effect of pain on her ability to perform substantial gainful activity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) Williams must show that she became disabled between August 27, 2011, the alleged onset date, and December 31, 2012, the date last insured, in order to be entitled to DIB benefits. The ALJ found that Smith had the residual functional capacity to perform a limited range of

sedentary work. (R. at 34.) Based on my review of the record, I find that substantial evidence exists to support the ALJ's finding with regard to Williams's residual functional capacity.

Williams argues that the ALJ erred by failing to give appropriate credence to her testimony and to properly assess the effect of pain on her ability to perform substantial gainful activity. (Plaintiff's Brief at 4-6.) Williams does not challenge the ALJ's finding with respect to her alleged mental impairments.

I find that the ALJ reasonably found that Williams's subjective complaints of disabling functional limitations were not credible. When an ALJ finds there is a medically determinable impairment that could reasonably be expected to produce a claimant's alleged complaints, he must evaluate the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities. *See* 20 C.F.R. § 404.1529(c)(1) (2015). Evidence considered at this stage includes a claimant's subjective complaints, medical evidence, other relevant evidence in the record, and inconsistencies in the evidence or conflicts between the claimant's statements and the rest of the evidence. *See* 20 C.F.R. §§ 404.1529(a), (c)(1), (c)(4) (2015). The ALJ need not accept as credible a claimant's statements regarding the severity, persistence or disabling effects of her symptoms where the ALJ finds that those statements are inconsistent with other evidence of record. *See Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996).

The ALJ concluded that Williams's allegations of total disability were not

-16-

entirely credible because the record evidence did not support a finding that Williams was completely disabled during the relevant period. (R. at 34-36.) The ALJ noted Williams's conservative treatment, the fact that she worked for five years following her 2006 motor vehicle accident and the fact that she worked during her incarceration cleaning bathrooms. (R. at 35-36.) In addition, Williams worked following her release from prison in a laundry/dry cleaner and sandwich maker as a term of her probation. (R. at 56.) Such work activity is significant, even if it was not performed full-time, because it undermines Williams's claims that her pain and symptoms rendered her disabled from all work. *See* 20 C.F.R. § 404.1571 (2015) ("The work, without regard to legality, that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level.").

The ALJ acknowledged Williams's report of chronic leg pain on numerous occasions, but he was persuaded by the evidence showing that Williams's range of motion stayed intact, she had no tenderness in the head or neck of her femur and she had no edema in her extremities. (R. at 35.) The ALJ noted that the record failed to support Williams's claim that she needed to elevate her legs, and that her demonstration of full range of motion on examinations belied such a finding. (R. at 36, 61.) The record confirms that Williams's physical examinations during the relevant time period typically revealed that she had normal findings, including normal gait and station and normal stability. (R. at 287-88, 290-91, 293-94, 297, 299-300, 305-06, 378, 381-82, 384-85.) The ALJ also noted the x-ray findings that confirmed Williams had lumbar degenerative disc disease at the L3-L4 level and

-17-

mild arthritic changes of the sacroiliac joints and moderately severe right knee arthritis. (R. at 334.) While Williams stated that she used a cane when her pain was "really … bad," there is no evidence that a physician prescribed a cane for her. (R. at 61.) In addition, Williams reported in September 2012 and January 2013 that nonopioid analgesics relieved her pain. (R. at 414, 417.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Based on this, I find that the ALJ properly analyzed Williams's allegations of pain.

For all of the reasons stated herein, I find that substantial evidence supports the ALJ's finding with regard to Williams's residual functional capacity and his finding that Williams was not disabled. An appropriate Order and Judgment will be entered.

ENTERED: December 28, 2015.

*s/ Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE